## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **JUDY NICOLE JACOBS, individually and** | § | |
| **as next friend of C.J., A MINOR, and** | § | |
| **CAMERAN E. JACOBS,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | **CASE NO.: 3:23-CV-00132** |
| **v.** | § | |
| | § | **JUDGE: JEFFREY V. BROWN** |
| **ABBOTT LABORATORIES, INC., d/b/a** | § | |
| **ABBOTT NUTRITION, H-E-B, LP and** | § | |
| **HEBCO GP, LLC,** | § | |
| | § | |
| *Defendants*. | § | |

### PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES, Plaintiffs, **JUDY NICOLE JACOBS, INDIVIDUALLY AND AS NEXT FRIEND OF C.J., A MINOR, and CAMERAN E. JACOBS, INDIVIDUALLY**, and file their First Amended Complaint against Defendant, **ABBOTT LABORATORIES, INC. d/b/a ABBOTT NUTRITION,** and in support of same, Plaintiffs would respectfully show unto the Court as follows:

### I.
### PARTIES

1.    Plaintiff, **JUDY NICOLE JACOBS, INDIVIDUALLY, AND AS NEXT FRIEND OF C.J. A MINOR**, is an individual of the full age of majority who currently resides in Baytown, Chambers County, Texas, and is a legal guardian and biological

mother of C.J., a minor, and has appeared herein through the undersigned Plaintiffs' counsel.

2.    Plaintiff, **CAMERAN E. JACOBS**, is an individual of the full age of majority who currently resides in Baytown, Chambers County, Texas, and is the husband of Judy Nicole Jacobs and is also a legal guardian and biological father of C.J., a minor, as has appeared herein through the undersigned Plaintiffs' counsel.

3.    Plaintiffs, **JUDY NICOLE JACOBS, INDIVIDUALLY, AND AS NEXT FRIEND OF C.J., A MINOR, AND CAMERAN E. JACOBS** will sometimes be collectively referred to hereinafter as "Jacobs" or "Plaintiffs."

4.    Defendant, **ABBOTT LABORATORIES, INC. D/B/A ABBOTT NUTRITION ("ABBOTT")**, is a corporation organized under the laws of the State of Delaware with a principal place of business in Abbott Park, Lake County, Illinois, and is registered to conduct business in Texas as foreign for-profit corporation throughout the State of Texas, including in Chambers County, Texas.  **ABBOTT** has been and still is engaged in the business of designing, manufacturing, packaging, labeling, distributing, promoting, marketing, advertising, and selling baby formula, including but not limited to its product labeled Similac Infant Formula.  **ABBOTT** sells its products, including Similac Infant Formula, and place them into the stream of commerce throughout Texas, including Chambers County, and the United States.  **ABBOTT** has been served with process and citation and is before the Court and has appeared herein through its counsel of record.

**II.**
**JURISDICTION AND VENUE**

5.      Plaintiffs assert that they did not have complete diversity between themselves, **ABBOTT**, and the former defendants, **H-E-B, LP** and **HEBCO GP, LLC**.  However, by the Court's Order dated August 1, 2023 (Document 22), Defendants, **H-E-B, LP** and **HEBCO GP, LLC**, were dismissed from this case without prejudice, thereby leaving only Defendant, **ABBOTT**.  Given the Court's Order dated August 1, 2023 (Document 22), complete diversity exists between Plaintiffs and Defendant, **ABBOTT,** and as a result, federal diversity jurisdiction exists for this case and over the Plaintiffs and **ABBOTT**, pursuant to 28 U.S.C.A, § 1332(a)(1).

6.      Venue is proper in the U.S. Southern District of Texas – Galveston Division, under 28 U.S.C.A. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred within the U.S. Southern District of Texas; specifically, in Mont Belvieu, Texas, Baytown, Texas and/or Anahuac, Texas (all located in Chambers County, Texas).

7.      At all relevant times to this lawsuit, Defendant, **ABBOTT**, individually and through its affiliated entities, designed, manufactured, and distributed its products, including but not limited to, Similac Infant Formula, through agent retailers, such as **H-E-B, LP** referenced above, throughout the State of Texas as its business.  **ABBOTT's** systematic and extensive conduct was specifically directed at consumers in the State of Texas, including

the Plaintiffs among other consumers who resided within the U.S. Southern District of Texas, and resulted in significant economic benefits for **ABBOTT**.

8.      In the course of its business, **ABBOTT**, designed, manufactured and distributed baby formula, including the Similac Sensitive Optigro Infant Formula with Iron, from lot 20974RE 217 at issue in this case.  This case arises out of **ABBOTT's** conduct directed at the State of Texas.  It should come as no surprise to **ABBOTT** that it would be hailed into a Court in Texas to be held accountable for designing, manufacturing and distributing a defective and unsafe baby formula that it purposefully placed into the stream of commerce and distributed to its agent retailers in Texas, including within the U.S. Southern District of Texas.

### III.
### <u>NATURE OF THE CASE AND</u>
### <u>GENERAL FACTUAL ALLEGATIONS</u>

9.      This lawsuit is brought in accordance with the laws of the State of Texas for the recovery of those damages that the Plaintiffs are justly entitled to recover over and from the Defendant herein, relating to the Plaintiffs' purchase of contaminated baby formula, namely Similac Sensitive Optigro Infant Formula with Iron, which was contaminated with a deadly bacteria known as *Cronobacter Sakazakii.*  The baby formula was consumed by the Plaintiffs' infant son, C.J., and proximately caused severe and debilitating injuries to C.J. and damages to the Plaintiffs.

10.     **ABBOTT** manufactures, labels, markets, and sells infant formula under the Similac, Alimentum, and EleCare brands.  The subject Similac Sensitive Optigro Infant

Formula with Iron was purchased by the Plaintiffs from an HEB grocery store located in Mont Belvieu, Texas in September 2020.  It is believed the subject Similac Sensitive Optigro Infant Formula with Iron came from a lot of baby formula manufactured in **ABBOTT's** manufacturing plant located in Casa Grande, Arizona.  However, despite knowing that it had problems with producing contaminated infant formula at its manufacturing facility, **ABBOTT** failed and/or refused to take decisive action to protect the public, including the Plaintiffs.

11.    **ABBOTT** distributed its infant formula to **H-E-B, LP**, a retailer in Texas, and **ABBOTT** knew that its infant formula would be sold by **H-E-B, LP,** to members of the general public in Texas, including **ABBOTT's** Similac Sensitive Optigro Infant Formula with Iron mentioned above and that is more fully described below.

12.    Plaintiffs purchased the Similac Sensitive Optigro Infant Formula with Iron from the H-E-B, LP store for their infant son's daily consumption.  The Similac Sensitive Optigro Infant Formula with Iron was in the same condition at the time C.J. was injured as it was when it was originally manufactured and at the time it was sold by H-E-B, LP to Plaintiffs. Had Plaintiffs known of the contamination of *Cronobacter Sakazakii* in the baby formula, they would never have purchased the subject Similac Sensitive Optigro Infant Formula with Iron and  never would have fed the said formula to their infant son.

13.    Similac, owned and made by **ABBOTT**, tells consumers that "[t]he Promise of Similac… [is] to help keep your baby fed, happy, and healthy"[1] and that the Similac brand

---

[1] *Similac Home,* Abbott, 2022, https://www.similac.com/home.html (last visited Feb. 20, 2022).

is "Nutrition you can trust."[2]   But recent testing at one of Defendant's manufacturing facilities tells a different story - one of broken promises, mistrust and concealment. After receiving consumer complaints of *Cronobacter Sakazakii* and *Salmonella* infections, the FDA's investigation along with the U.S. Centers for Disease Control and Prevention, and state and local partners, confirmed that Abbott's Sturgis, Michigan facility had findings to date of "several positive *Cronobacter Sakazakii* results from environmental samples taken by the FDA and adverse inspectional observations by the FDA investigators."[3]

14.    Moreover, Politico reported that the FDA first received a report of a foodborne illness suspected to be linked to infant formula in September, four months before issuing the recall of three major brands, after four (4) babies were hospitalized and one died.[4] The state agency told Politico that the Minnesota Department of Health investigated a case of an infant who was sickened by *Cronobacter Sakazakii* in September 2021.[5]   State health officials in Minnesota knew that the infant had consumed powdered formula produced at an Abbott Nutrition facility in Sturgis, Michigan, and shared this information with the FDA and CDC in September 2021.[6] Inspectors found *Cronobacter Sakazakii* in several environmental samples taken at the plant, *as well as records suggesting the company had been finding the bacteria in the plant and had destroyed product because of the*

---

[2] *The Promise of Similac*, Abbott, 2022 https://www.similac.com/why-similac/promise-of-similac.html (last visited Feb. 20, 2022).
[3] *FDA News Release*, Feb. 17, 2022, https://www.fda.gov/news-events/press-announcements/fda-warns-consumers-not-use-certain-powdered-infant-formula-produced-abbott-nutritions-facility (last visited Feb. 20, 2022).
[4] FDA learned of suspected infant formula illness four months before recall, February 18, 2022, https://www.politico.com/news/2022/02/18/fda-infant-formula-illness-four-months-before-recall-00010226 (last visited Feb. 20, 2022).
[5] *Id.*
[6] *Id.*

*issue.*[7]  It is believed and asserted that similar conduct had occurred also at **ABBOTT**'s production facility in Casa Grande, Arizona.

15.    On February 17, 2022, the U.S. Food and Drug Administration ("FDA") announced it was investigating consumer complaints of *Salmonella* and *Cronobacter Sakazakii* infections  related to the ingestion of Similac, Alimentum and EleCare.

16.    Specifically, the FDA announced it was: "investigating consumer complaints of *Cronobacter sakazakii* and *Salmonella* Newport infections. All of the cases are reported to have  consumed powdered infant formula produced from Abbott's Sturgis, Michigan facility. As a result  of the ongoing investigation, along with the U.S. Centers for Disease Control and Prevention ("CDC") and state and local partners, the FDA is alerting consumers to avoid purchasing or using  certain powdered infant formula products produced at this facility. This is an ongoing  investigation, and the firm is working with the FDA to initiate a voluntary recall of the potentially  affected product."[8]

17.    The FDA news release also advised it was "investigating complaints of four infant illnesses from three states. All four cases related to these complaints were hospitalized and *Cronobacter* may have contributed to a death in one case. The FDA has initiated an onsite  inspection at the facility. Findings to date include several positive *Cronobacter sakazakii* results from environmental samples taken by the FDA and adverse inspectional

---

[7] *Id.*

[8] *FDA News Release*, Feb. 17, 2022, https://www.fda.gov/news-events/press-announcements/fda-warns-consumers-not-use-certain-powdered-infant-formula-produced-abbott-nutritions-facility (last visited Apr. 18, 2022).

observations by the FDA  investigators. A review of the firm's internal records also indicate environmental contamination   with *Cronobacter sakazakii* and the firm's destruction of product due to the presence of  *Cronobacter*."[9]

18.    So far, the FDA has linked two infant deaths and multiple illnesses to the contamination of Abbot's Similac, Alimentum, and EleCare powdered infant formulas produced  in its Sturgis, Michigan plant.[10]

19.    As part of the Warning, Frank Yiannas, FDA Deputy Commissioner for Food Policy and Response, stated:

> **"As this is a product used as the sole source of nutrition for many of our nation's newborns and infants, the FDA is deeply concerned about these reports of bacterial infections."[11]**

20.    On February 17, 2022, Defendant initiated a voluntary recall of infant formula under the Similac, Alimentum and EleCare brands due to "[c]onsumer complaints regarding *Cronobacter sakazakii* [and] *Salmonella*" infections.[12] However, the recall did not include a  refund, reimbursement, or replacement for consumers who purchased or used the recalled  products.

---

[9] *Id.*

[10] *FDA Investigation of Cronobacter Infections: Powdered Infant Formula*, FDA: RECALLS, OUTBREAKS & EMERGENCIES, https://www.fda.gov/food/outbreaks-foodborne-illness/fda-investigation-cronobacter-infections-powdered-infant-formula-february-2022 (last updated Mar. 31, 2022).

[11] *See supra* note 8.

[12] *Abbott Voluntarily Recalls Powder Formulas Manufactured at One Plant*, FDA: Recalls, Market Withdraws, & Safety Alerts (Feb. 17, 2022), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/abbott-voluntarily-recalls-powder-formulas-manufactured-one-plant.

21.    According to the FDA, *Cronobacter* bacteria can cause severe, life-threatening infections (sepsis) or meningitis (an inflammation of the membranes that protect the brain and spine). Symptoms of sepsis and meningitis may include poor feeding, irritability, temperature changes, jaundice (yellow skin and whites of the eyes), grunting breaths and abnormal movements. *Cronobacter* infection may also cause bowel damage and may spread through the blood to other parts of the body.[13] Further, according to the CDC, *Cronobacter* infections are often very serious for babies and can result in death.[14]

22.    The FDA conducted three Form 483 inspections, which uncovered numerous violations of statutes and regulations as set forth herein in Defendant's manufacturing, processing, packing, and holding of Similac, Alimentum, and EleCare powdered infant formulas—one in September of 2019, the second in September of 2021, and the third from January through March of 2022.[15]

23.    The purpose of an FDA Form 483 inspection is to "notif[y] the company's management of objectionable conditions" and note any observed "conditions that in [the investigator's] judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts."[16]

---

[13]*See supra* note 8.

[14]*CDC Cronobacter*, 2022, https://www.cdc.gov/cronobacter/index.html (last visited Apr. 18, 2022)

[15] See *supra* note 10.

[16] *FDA Form 483 Frequently Asked Questions*, FDA: Inspections, Compliance, Enforcement, and Criminal Investigations, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last updated Jan. 9, 2020).

24.    As documented in the FDA Form 483 issued on September 24, 2019, Defendant failed to "test a representative sample of a production aggregate of powdered infant formula at the final product stage and before distribution to ensure that the production aggregate meets the required microbiological quality standards."[17]

25.    Subsequent inspections established a pattern of Defendant's disregard of reasonable, responsible industry practices with respect to the manufacturing, processing, packing, and holding of its powdered infant formulas.

26.    As documented in the FDA Form 483 issued on September 24, 2021, Abbott:

- Failed to "maintain a building used in the manufacture, processing, packing, or holding of infant formula in a clean and sanitary condition";[18] and

- Had "[p]ersonnel working directly with infant formula, its raw materials, packaging, or equipment or utensil contact surfaces did not wash hands thoroughly in a hand washing facility at a suitable temperature after the hands may have become soiled or contaminated."[19]

27.    On March 18, 2022, the FDA released the findings from its 2022 Form 483 inspection conducted at Abbott's facility, which noted that Abbott:

---

[17] 2019 FDA Form 483 Observations, https://www.fda.gov/media/156748/download?utm_medium=email&utm_source=govdelivery (last visited Apr. 18, 2022).

[18] 2021 FDA Form 483 Observations, https://www.fda.gov/media/156747/download?utm_medium=email&utm_source=govdelivery (last visited Apr. 18, 2022).

[19] *Id.*

- Failed to "establish a system of process controls covering all stages of processing  that was designed to ensure that infant formula does not become adulterated due to  the presence of microorganisms in the formula or in the processing environment";[20]

- Failed to "ensure that all surfaces that contacted infant formula were maintained to  protect infant formula from being contaminated by any source";[21]

- Failed to document any "determination as to whether a hazard to health exists" due  to contamination with microorganisms;[22] and

- Had "[p]ersonnel working directly with infant formula, its raw materials, packaging, equipment, or utensil contact surfaces [who] did not wear necessary  protective apparel."[23]

28.    Additionally, Abbott's own records indicate that, in June of 2020, Abbott destroyed products due to a previous *Cronobacter* contamination[24], establishing that Abbott, at various times:

   a. Had knowledge that *Cronobacter* contaminated its powdered infant formula manufactured, processed, and packaged at its Sturgis, Michigan plant;

   b. Failed to adequately test for *Cronobacter* in its powdered infant formula; and

   c. Failed to ensure sufficient controls were in place to prevent contamination of its powdered infant formula manufactured, processed, and packaged at its Sturgis,  Michigan plant.

---

[20] 2022 FDA Form 483 Observations,
https://www.fda.gov/media/157073/download?utm_medium=email&utm_source=govdelivery (last visited Apr. 18, 2022).
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *See supra* note 8.

29.     The results of these investigations demonstrate a pattern of **ABBOTT** not only failing to take adequate, reasonable measures to protect the health and lives of infants consuming  its powered infant formula products, but also failing to take even the common-sense measures,  such as  washing hands,  upon  learning  of  the  risk  of contamination of its products with microorganisms.

30.     Given the facts stated above, it is clear that **ABBOTT** has had ongoing problems throughout its manufacturing facilities with quality control and with producing, manufacturing, packing, labeling, promoting, marketing, advertising and distributing contaminated infant formula at its manufacturing facilities, and **ABBOTT** failed and/or refused to take decisive action to protect the public, including the Plaintiffs.  Interestingly, the Plaintiffs were injured by a contaminated product from **ABBOTT's** facility in Casa Grande, Arizona, approximately one (1) year prior to the latest news reports of the same contamination found in similar baby formula products at **ABBOTT's** manufacturing facility in Sturgis, Michigan, as described above, and it is Plaintiffs belief that **ABBOTT** operated under the same and/or similar practices, policies, or procedures at each of its facilities, including the Sturgis and Casa Grande facility.  It is equally clear that the production and distribution of similarly contaminated products from **ABBOTT's** different manufacturing plants located across the United States are not isolated incidents for **ABBOTT**, but instead illustrate **ABBOTT's** companywide reckless disregard and/or negligent behavior for safety or a complete lack of safety protocols; failed quality control; inadequate, defective, and/or incorrect formulation in the manufacturing of said baby formula; faulty and/or defective

design of the baby formula, lack of warnings, inadequate or failed packaging, inadequate or failed labeling, misleading marketing, advertising and/or promotions of safe baby formula, and the absence of practices, policies, procedures and/or preventative measures to ensure that no contamination occurs during its manufacturing, packaging, labeling and distribution processes of its products, including but not limited to, the subject Similac Sensitive Optigro Infant Formula with Iron.

31.    On March 8, 2023, the FDA issued a written notification to all infant formula manufacturers, packers, distributors, exporters, importers, and retailers regarding its investigation into its finding of the *Cronobacter* contamination found in powdered infant formula at Abbott's facility in Sturgis.  In that written notification, the FDA asked that all recipients of the letter follow the following call of action:

1.    Evaluate your established system of production and in-process controls (which must cover all stages of processing, from the receipt and acceptance of the raw materials, ingredients, and components through the storage and distribution of the finished product) and ensure that appropriate controls are implemented in accordance with 21 CFR 106.6(c) at any point, step, or stage in the production process where control is necessary to prevent adulteration of infant formula;

2.    Ensure full compliance with all relevant regulations – including the Infant Formula Requirements Pertaining to Current Good Manufacturing Practice, Quality Control Procedures, Quality Factors, Records and Reports, and Notifications rule (21 CRF part 106) and the Current Good Manufacturing Practice, Hazard Analysis, and Risk-Based Preventive Controls for Human Food rule (21 CRF part 117);

3.    Consider the concerns shares in this letter when evaluating your established system of production and in-process controls, including when taking corrective actions; and

    4.      Ensure adherence to the notification requirement of an adulterated or misbranded infant formula any time product has left the facility, in accordance with 21 CFR 106.150.

32.    The FDA further stated in its letter of March 8, 2023:

"The FDA has reviewed conditions during recent inspections of powdered infant formula manufacturers, including routine surveillance inspections, for-cause inspections to follow up on consumer complaints, and other interactions with manufacturers.[25]   FDA has identified the following areas for improvement across the infant formula industry:

    1.      Controlling water in dry production areas;

    2.      Verifying the effectiveness of controls through environmental monitoring;

    3.      Implementing appropriate corrective actions following the isolation of a pathogen from an environmental sample or a product sample;

    4.      Implementing effective supply-chain controls for biological hazards; and

    5.      Identifying all relevant biological hazards.

FDA is sharing this information with you with the expectation that you will act to mitigate potential food safety risks in powdered infant formula in accordance with FDA regulations while further striving to improve operations, especially given the critical nature of these products."

Clearly the FDA found that there were issues with the infant formula industry that

needed to be addressed by manufacturers, particularly with **ABBOTT**.

---

[25] Footnote omitted.

## IV.
## SPECIFIC FACTUAL ALLEGATIONS

33.     Plaintiffs repeat, reiterate, and reallege, each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

34.     Plaintiff, C.J., a minor, was born on September 19, 2020.  C.J. was born full term without pregnancy or delivery complications at 38 weeks and 5 days.  Upon birth, C.J. was drinking premade formula provided by the hospital.  The hospital provided C.J. with liquid Similac Regular infant formula, but within two (2) feedings, the hospital changed C.J. to Similac Sensitive infant formula.  C.J. continued to use this formula until he changed to the store-bought formula on September 21, 2020, after being discharged from the hospital.  The store-bought formula was a can of dry powdered Similac Sensitive Optigro Infant Formula with Iron, from lot 20974RE 217 with additional information stamped on the bottom of the formula can stating "USE/BY 1MAR2022 1731 SSENPWD."  The subject formula was mixed with H-E-B Baby Distilled Water, 1 GAL, from lot PKD 082120 2027 X3 EXP 082121 CAD 0821.  Both the formula and the water were purchased from the H-E-B located at 13401 I-10 East, Mont Belvieu, Texas 77523.  Additionally, Parent's Choice Distilled Water, 1 GAL. from lot PKD 082120 10:40 EXP 082721 X3, was purchased by the Plaintiffs from Walmart located at 8700 TX-146, Baytown, Texas 77523, and was also used to mix C.J.'s formula.  C.J. continued to consume the subject baby formula until he was admitted to the hospital shortly after his consumption of this formula.  Interestingly, **ABBOTT** provided Plaintiffs with written express warranties by promotion and  other

means that said Similac baby formula was safe for use and promised to give babies a strong start by helping to keep them fed, happy, and healthy, along with express representations on the formula's label that **ABBOTT's** Optigro infant formula was good for "Brain Nourishing," "Eye Health," "Growth & Development," and that is was the "#1 Pediatrician Recommended Infant Formula Brands."

35.    On or about September 30, 2020, C.J. became ill when he developed a fever, body aches, and poor feeding and was taken to an urgent care facility, where he was given a Covid-19 test which was negative.  C.J. received no further treatment and was released to go home.  After returning home, when C.J. continued to run fever, exhibit fussiness, and refuse feedings, C.J.'s father and mother felt there was something more affecting C.J., and took C.J. to Texas Children's Hospital located in Houston, Texas.  After entering the emergency room, C.J. was admitted into Texas Children's Hospital due to concern of bacterial meningitis.  An LP (lumbar puncture) was performed on C.J. that obtained cerebral spinal fluid, which revealed C.J. had bacterial meningitis caused by *Cronobacter Sakazakii*.

36.    On October 3, 2020, C.J. received an MRI which showed a subdural empyema.  On October 3, 2020, C.J. had brain surgery to evacuate the subdural empyema and brain abscess.   Because of C.J.'s diagnosis of acute postoperative respiratory failure, hypoglycemia, and dehydration fever, C.J. remained admitted under hospital care until he was released on October 30, 2020.

37.    On or about October 7, 2020, representatives from Texas Department of State Health Services (DSHS), collected the used can of Similac Sensitive Optigro Infant Formula with

Iron from the Plaintiffs. At the time of collection, more than one-half of the dry powder formula contents remained in the can. On the same date, the DSHS made a preliminary determination that the powder formula contents in the can tested <u>positive</u> for *Cronobactor species*. After the preliminary determination was made, the DSHS notified the U.S. Food and Drug Administration of the finding due to public safety concerns because similar cans of baby formula were still being sold in Texas at the HEB stores and other retailers in Texas and in the United States. Also, on October 15, 2020, the DSHS Lab subsequently retested and <u>confirmed</u> that the powder formula contents in the can once again tested <u>positive</u> for *Cronobactor species*.

38.    On or about November 4, 2020, investigators from the U.S. Food and Drug Administration, met with Plaintiff, Judy Nicole Jacobs, to collect the intact samples of water used for the formula including: one (1) bottle of H-E-B Baby Distilled Water, 1 GAL, from lot PKD 082120 2027 X3 with an EXP 082121 CAD 0821; and one (1) bottle of Parent's Choice Distilled Water, 1 GAL. from lot PKD 082120 10:40 with an EXP 082721 X3. Both bottles of water were subsequently tested by the DSHS and/or FDA for *Cronobactor species*, but both tested negative.

39.    Following his treatment and hospitalization for bacterial meningitis, C.J. underwent extensive follow-up care following his brain surgery. C.J. also showed signs of slow development with his speech and hearing, and as a result, C.J. underwent frequent speech and hearing therapy. It was determined that C.J. sustained severe and permanent hearing loss in his left ear due to the bacterial meningitis that he contracted. This also resulted in

slow speech development for C.J., for which he continues to receive speech and hearing therapy and treatment to help with his condition.  Given C.J.'s young age and permanent medical condition, it is within all medical probability that C.J. will continue to need speech and hearing therapy, treatment, surgery and/or aides for the remainder of his life.

**V.**
**CAUSES OF ACTION**

**A.    FIRST CAUSE OF ACTION – NEGLIGENCE OF ABBOTT**

40.    Plaintiffs incorporate by reference the foregoing paragraphs above as if fully set forth herein.

41.    **ABBOTT** formulated, designed, manufactured, promoted, marketed, advertised, packaged, labeled, distributed and/or sold the Similac Sensitive Optigro Infant Formula with Iron to consumers, including the Plaintiffs.

42.    Plaintiffs' purchase and use of the Similac Sensitive Optigro Infant Formula with Iron containing *Cronobacter Sakazakii*, caused C.J. serious infections and illnesses including, but not limited to, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities.

43.    **ABBOTT** had a duty to exercise reasonable care in the formulation, design, manufacturing, production, promotion, marketing, advertising, packaging, labeling, distribution and sale of the Similac Sensitive Optigro Infant Formula with Iron, including a duty to ensure that the subject baby formula was safe for use and a duty to warn that such

baby formula may contain *Cronobacter Sakazakii* and cause infections, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities.

44.    As set forth in detail above, **ABBOTT** breached the standard of care when it failed to exercise reasonable care in the formulation, design, manufacturing, production, promotion, marketing, advertising, packaging, labeling, distribution, and sale of the Similac Sensitive Optigro Infant Formula with Iron by failing to ensure that the subject baby formula was safe for use.

45.    Specifically, **ABBOTT** was negligent in the formulation, design, manufacturing, production, promotion, marketing, advertising, packaging, labeling, distribution, and sale of the Similac Sensitive Optigro Infant Formula with Iron, in that **ABBOTT**, among other things:

(a)    Failed to use reasonable care in formulating, designing, and manufacturing the Similac Sensitive Optigro Infant Formula with Iron, so as to ensure that it was safe for use and did not cause adverse health effects including, but not limited to *Cronobacter Sakazakii*, infections, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities;

(b)    Failed to conduct adequate safety testing and/or quality control of the Similac Sensitive Optigro Infant Formula with Iron and the ingredients used to make such product;

(c)    Failed to accompany the Similac Sensitive Optigro Infant Formula with Iron with proper warnings, promotions, advertising, marketing, instructions and/or labels regarding the possible contamination and/or adverse health effects associated with its use including, but not limited to, *Cronobacter Sakazakii*, infections, fevers, bacterial meningitis, brain abscess, subdural

empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities; and

(d)     Targeting parents of infants like the Plaintiffs, to sell its baby formula by using false, misleading and/or deceptive advertising, labeling, marketing and/or promotion that the baby formula does not possess.

46.     That **ABBOTT** breached the abovementioned duties to Plaintiffs.

47.     That **ABBOTT's** breach of the abovementioned duties was a proximate cause of Plaintiffs' injuries.

48.     **ABBOTT** knew or should have known that consumers, including Plaintiffs, would foreseeably be put at risk of *Cronobacter Sakazakii*, infections, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities to infant children as a result of **ABBOTT's** failure to give warning of the adverse health effects associated with use of the Similac Sensitive Optigro Infant Formula with Iron.

49.     **ABBOTT's** negligence proximately caused Plaintiffs to be injured, including, but not limited to, the following health related injuries, significant exposure to toxic substances, *Cronobacter Sakazakii*, infections, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities and other related injuries, as well as the associated costs of medical treatment and therapy.

50.     As a direct and proximate result of **ABBOTT's** negligence, Plaintiffs, individually, and as legal guardian of C.J., a minor child, suffered significant injuries and damages,

some of which will be permanent and continuing in nature, and Plaintiffs will suffer the injuries and impairment in the future, and economic damages. Plaintiffs would not have purchased said contaminated Similac Sensitive Optigro Infant Formula with Iron if they had known the true facts.

51.    ***Res Ipsa Loquitur Applies***.  Plaintiffs cannot more specifically allege the acts of negligent manufacture or design on the part of **ABBOTT**, because facts in that regard are peculiarly within the knowledge of **ABBOTT**.  In the alternative, in the event Plaintiffs are unable to prove specific acts of negligent design or manufacture, Plaintiffs rely on the doctrine of *res ipsa loquitur*.  In this connection, Plaintiffs will show that the character of the occurrence giving rise to this litigation is such that it would not have happened in the absence of negligence, and that the design and manufacture of the Similac Sensitive Optigro Infant Formula with Iron was within the exclusive control of Defendant, **ABBOTT,** at the time the negligence probably occurred.  Plaintiffs had no means of ascertaining the method or manner in which the Similac Sensitive Optigro Infant Formula with Iron was designed and manufactured, and it came into the Plaintiffs' possession in the same condition it was in when it left the control of **ABBOTT**. Thus, **ABBOTT** was negligent in the design and/or the manufacture of the Similac Sensitive Optigro Infant Formula with Iron, which negligence was a proximate cause of the injuries and damages sustained by Plaintiffs.

**B.**     **SECOND CAUSE OF ACTION - STRICT PRODUCT LIABILITY OF ABBOTT**

52.     Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

53.     **ABBOTT** formulated, designed, manufactured, produced, promoted, marketed, advertised, packaged, labeled, distributed and/or sold Similac Sensitive Optigro Infant Formula with Iron, or has partnered to formulate, design, manufacture, promote, market, advertise, package, label, distribute and/or sell said Similac Sensitive Optigro Infant Formula with Iron.

54.     At all times relevant, **ABBOTT** knew or should have known that Similac Sensitive Optigro Infant Formula with Iron contained a non-obvious danger in the ingredients, as well as of the dangers of contaminated infant formula as described in this Complaint.

55.     The Similac Sensitive Optigro Infant Formula with Iron that **ABBOTT** formulated, designed, manufactured, produced, promoted, marketed, advertised, packaged, labeled, distributed and/or sold was defective in its formulation, design and/or manufacturing. Further, the Similac Sensitive Optigro Infant Formula with Iron was defective when it left the control of **ABBOTT** such that: (1) the foreseeable risks of *Cronobacter Sakazakii*, infections, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities to infant children posed by the contaminated Similac Sensitive Optigro Infant Formula with Iron exceeded the benefits associated with the formulation,

design and manufacturing of the Similac Sensitive Optigro Infant Formula with Iron; or (2) the said Similac Sensitive Optigro Infant Formula with Iron was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other similar products.

56.    **ABBOTT** knew that Plaintiffs would use the Similac Sensitive Optigro Infant Formula with Iron and feed it to their infant son, C.J., without expecting to be put at risk of *Cronobacter Sakazakii*, infections, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities to their infant son.  However, **ABBOTT** failed to warn Plaintiffs as to the potential adverse health effects that using said contaminated Similac Sensitive Optigro Infant Formula with Iron could have.

57.    The subject Similac Sensitive Optigro Infant Formula with Iron was expected to and did reach Plaintiffs without substantial change in condition.

58.    The  subject Similac Sensitive Optigro Infant Formula with Iron that **ABBOTT** formulated, designed, manufactured, produced, promoted, marketed, advertised, packaged, labeled, distributed and/or sold was defective due to  inadequate formulation, design, manufacture, safety testing and inadequate warning of the Similac Sensitive Optigro Infant Formula with Iron's true nature.

59.    Had Plaintiffs been warned about the contaminated Similac Sensitive Optigro Infant Formula with Iron and the risk of *Cronobacter Sakazakii*, infections, fevers, bacterial meningitis,  brain abscess, subdural empyema, acute postoperative respiratory failure,

hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities to their infant son, as a result of the use of the Similac Sensitive Optigro Infant Formula with Iron and/or the danger that they posed, they would not have purchased, acquired or used the Similac Sensitive Optigro Infant Formula with Iron.

60.     Plaintiffs were harmed directly and proximately by **ABBOTT'S** failure to warn and defectively designed the Similac Sensitive Optigro Infant Formula with Iron. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; *Cronobacter Sakazakii*, infections, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, speech disabilities, and developmental issues.

61.     As a direct and proximate result of **ABBOTT'S** failure to warn and defective design, Plaintiffs, individually, and as legal guardian of C.J., a minor child, suffered significant injuries and damages, some of which will be permanent and continuing in nature, and Plaintiffs will suffer the injuries and impairment in the future, and economic damages. Plaintiffs would not have purchased said contaminated Similac Sensitive Optigro Infant Formula with Iron if they had known the true facts.

62.     Plaintiffs further invoke all rights and remedies afforded them under Chapter 82.001, *et seq.*, of the Texas Civil Practices and Remedies Code.

## C.     <u>THIRD CAUSE OF ACTION - BREACH OF EXPRESS WARRANTY</u>

63.     Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

64.     Defendant provided Plaintiffs with written express warranties by promotion and other means that said Similac products were safe for use and promised to give babies a strong start  by helping to keep them fed, happy, and healthy, along with express representations on the formula's label that **ABBOTT's** Optigro infant formula was good for "Brain Nourishing," "Eye Health," "Growth & Development," and that is was the "#1 Pediatrician Recommended Infant Formula Brands."   Defendant made these representations in describing the product, as an affirmation of fact, a promise, and/or by displaying them on the label of the product that Plaintiffs purchased.  These representations by Defendant were a part of the bargain, and as stated above, the baby formula did not comply with the Defendant's representations, given the condition of the formula and the harm that was caused to the Plaintiffs.

65.     Defendant breached these warranties in violations of applicable law, by manufacturing, promoting, marketing, advertising, distributing and/or selling said contaminated  Similac baby formula which resulted in damages to Plaintiffs.

66.     Plaintiffs purchased said Similac baby formula unaware that it contained contaminants.

67.     But for **ABBOTT's** breach of warranty, Plaintiffs would not have purchased said Similac product.

68.     Plaintiffs further assert claims under all other applicable state laws governing express warranties.

69.    As a proximate result of this breach of warranty by Defendant, Plaintiffs have suffered economic and non-economic damages in an amount to be determined at trial. Plaintiffs are also entitled to recover their reasonable attorney's fees and/or costs incurred under Chapter 38 of the Texas Civil Practices and Remedies Code, for violation of express warranty.

70.    Plaintiffs were harmed directly and proximately by Defendant's breach of express warranty. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; *Cronobacter Sakazakii*, infections, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities to their infant son, as well as the associated costs of diagnostic screening and medical monitoring, and economic harm in that Plaintiff would not have purchased said contaminated Similac product if they had known the true facts.

## D.    FOURTH CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

71.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

72.    As alleged above, Defendant warranted that said Similac products were safe for use and promised to give babies a strong start by helping to keep them fed, happy and healthy.

73.    Thus, Defendant warranted that said Similac products were reasonably fit for the intended use for infant consumption.

74.     Because said Similac products described above contained contaminants, they are not reasonably fit for the uses intended or reasonably foreseeable.

75.     Plaintiffs purchased said Similac products unaware that they contained contaminants.

76.     But for Defendant's breach of warranty, Plaintiffs would not have purchased said Similac products.

77.     As a direct and proximate result of Defendant's breach of warranty, Plaintiffs suffered injury in fact and actual damages.

78.     As a proximate result of this breach of warranty by Defendant, Plaintiffs have suffered economic and non-economic damages in an amount to be determined at trial.

79.     Plaintiffs were harmed directly and proximately by Defendant's breach of warranty. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; *Cronobacter Sakazakii*, *Salmonella,* infections, fevers, bacterial meningitis, brain abscess, subdural empyema, acute postoperative respiratory failure, hypoglycemia, dehydration fever, permanent hearing loss, and speech disabilities to their infant son, as well as the associated costs of diagnostic screening and medical monitoring,  and economic harm in that Plaintiffs would not have purchased said contaminated Similac  products if they had known the true facts.

**E.** **FIFTH CAUSE OF ACTION – VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT (DTPA)**

80.     According to the facts and claims stated above, Defendant's actions, inactions, wrongs and/or omissions noted above, constitute violations of the following provisions of the Texas Deceptive Trade Practices Act – Consumer Protection Liability Act ("DTPA"), as ABBOTT engaged in false, misleading, and/or deceptive acts or practices that Plaintiffs relied on to Plaintiffs' detriment.   Specifically, **ABBOTT** represented to the public, including the Plaintiffs, that **ABBOTT's** Similac Sensitive Optigro Infant Formula with Iron formula was good for "Brain Nourishing," "Eye Health," "Growth & Development," and that is was the "#1 Pediatrician Recommended Infant Formula Brands," but such representations were false, misleading, and/or deceptive, to which the Plaintiffs relied upon.   Such representations violated the DTPA in the following manners:

(a)     Defendant represented that its goods and/or services had sponsorship, approval, characteristics, uses, benefits, or qualities they did not have.

(b)     Defendant represented that its goods or services were of a particular standard, quality, or grade when they were of another.

(c)     Defendant represented that a guarantee or warranty it provided to Plaintiffs conferred or involved rights or remedies which they did not have or involve.

(d)     Defendant failed to disclose information concerning its goods or services which was known at the time of the transaction, and such failure was intended

to induce Plaintiffs into a transaction into which they would not have entered had the information been disclosed.

(e)     Defendant has breached implied and express warranties, including its implied warranty of consumer goods.

(f)     Defendant's violations of the DTPA, with respect to its scope of services to be provided to the Plaintiffs, proximately caused damages to Plaintiffs that are identified in Section G below, which Defendant is responsible to pay.

81.     Plaintiffs relied on the representations of **ABBOTT** regarding Similac Sensitive Optigro Infant Formula with Iron to their detriment that the infant formula was safe for use by C.J. and that it would provide him nourishment as an infant, and that it would not be contaminated.  It is believed that **ABBOTT** had knowledge of and/or acted intentionally with careless disregard to the rights of consumers, such as the Plaintiffs, that its Similac Sensitive Optigro Infant Formula with Iron did not have the sponsorship, approval, characteristics, uses, benefits, or qualities as **ABBOTT** stated, which resulted in the violations of subsections (a) through (f) above and resulted in injury to the Plaintiffs.  As the foregoing violations are proximate causes of Plaintiffs' injuries, the Plaintiffs seek to recover any and all damages they are entitled to recover under the DTPA for **ABBOTT's** violations of same.

## F.     KNOWLEDGE AND/OR INTENTIONAL CONDUCT

82.     Pursuant to the foregoing factual allegations, Defendant violated provisions of TEX. BUS. & COM. CODE ANN. § 17.41 *et seq.*, commonly known as the Texas Deceptive

Trade Practices Consumer Protection Act ("DTPA"), upon the grounds that the acts and practices described herein are prohibited by this statute. Prior or pre-suit written notice of Plaintiffs' DTPA claims made herein are impractical and unnecessary in the manner and form required by DTPA § 17.505, as there was insufficient time for Plaintiffs to file such claims in this lawsuit. The unlawful acts and practices described above are and were a producing cause of damages to Plaintiffs. The unlawful acts and practices described above were committed knowingly and/or intentionally by Defendant; that is, Defendant had actual awareness of the falsity, deception or unfairness of the act or practice, coupled with the specific intent that Plaintiffs act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness. Accordingly, Plaintiffs are entitled to damages for the mental anguish they suffered and additional damages of up to three (3) times the amount of Plaintiffs' economic damages, all as provided by the DTPA. Defendant's conduct as described herein and the resulting damage and loss to Plaintiffs has necessitated Plaintiffs' retention of the attorneys whose names are subscribed hereto. Pursuant to DTPA § 17.50, Plaintiffs are, therefore, entitled to recover from Defendant an additional sum to compensate Plaintiffs for a reasonable fee for their attorneys' necessary services provided in the preparation and prosecution of this action, as well as a reasonable fee for any and all necessary appeals to other courts.

## G.   DAMAGES

83.     As a consequence of the product defects, violations of the DTPA, breach of warranties, and/or negligence, Plaintiffs have incurred actual and/or consequential

damages, are expected to incur damages in the future, and seek to recover the following damages:

a.    reasonable and necessary medical and other healthcare related expenses, both in the past and in the future;

b.    physical pain and suffering in the past and future;

c.    mental anguish in the past and future;

d.    physical impairment in the past and future;

e.    physical disfigurement in the past and future; and

f.    punitive or exemplary damages.

84.    Pursuant to the Federal Rules of Civil Procedure and the foregoing factual allegations and claims asserted by Plaintiffs against the Defendant herein, exceed $1,000,000.00 in damages, to which Plaintiffs seek to recover from the Defendant who is liable.

## VI.
## ATTORNEY'S FEES AND COSTS

85.    Pursuant to the allegations and claims asserted above, Plaintiffs seek recovery of their attorneys' fees and costs from the Defendant herein relating to its violations of the Texas DTPA pursuant to Sections 17.41, *et seq.*, and 17.50, *et seq.*, and breach of express warranty under Section 38 of the Texas Civil Practice and Remedies Code.

86.    Plaintiffs also seek all reasonable and necessary attorneys' fees in this case, which include the following:

(a)    preparation and trial of this lawsuit;

Page **31** of **34**

(b)     post-trial, pre-appeal legal services;

(c)     an appeal to the Court of Appeals;

(d)     making or responding to an application for writ of error to the Supreme Court of Texas;

(e)     an appeal to the Supreme Court of Texas in the event application for writ of error is granted; and/or

(f)     post-judgment discovery and collection in the event execution and judgment is necessary; and

(g)     pre-judgment and post-judgment interest.

## VII.
## CONDITIONS PRECEDENT

87.    All conditions precedent and pre-suit notice requirements to recover damages from the Defendant have been performed and/or met regarding the claims asserted herein by Plaintiffs.

## VIII.
## ALTERNATIVE PLEADINGS

88.    All pleadings are in the alternative.

## IX.
## INCORPORATION OF ALLEGATIONS

89.    All allegations made herein are incorporated into every other titled allegation.

## X.
## JURY DEMAND

90.     Pursuant to the Federal Rules of Civil Procedure, Plaintiffs make this demand for a jury trial in this litigation and tender the appropriate fee.

## XI.
## SELF-AUTHENTICATION

91.     Plaintiffs hereby invoke Rule 902 of the Federal Rules of Evidence regarding Self-Authentication.  This is a notice that Plaintiffs may use in pretrial or trial any pleading filed or document produced by Defendant.

## XII.
## CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs, **JUDY NICOLE JACOBS, INDIVIDUALLY AND AS NEXT FRIEND OF C.J., A MINOR, and CAMERAN E. JACOBS,** respectfully pray that upon trial hereof, that Plaintiffs be awarded and recover their actual damages as would be reasonably just and compensate them in accordance with the rules of law and procedure, as well as consequential damages, *treble* damage under the Texas DTPA, and any and all additional punitive and exemplary damages as may be found, along with their consequential damages.  In addition, Plaintiffs request the award of attorneys' fees for the trial and appeal of this case, for all costs of Court expended on their behalf, for prejudgment and post-judgment interest as allowed by law, and for any other and further relief, either at law or in equity, to which Plaintiffs may show themselves to be justly entitled to receive.

Respectfully submitted,

**HARGRODER LAW FIRM, PLLC**

*/s/Casey H. Hargroder*
CASEY H. HARGRODER
State Bar No. 24050718
2905 Toccoa Street
Beaumont, Texas 77703
(409) 832-0347 telephone
(409) 838-0167 facsimile
chargroder@hargroderlaw.com

**AND**

**BENNETT LEGAL, P.C.**

*/s/Barry C. Bennett*
BARRY C. BENNETT
State Bar No. 02137600
P. O. Box 5529
Beaumont, Texas 77726-5529
(409) 861-4590 telephone
barry@barrybennettlegal.com

**ATTORNEYS FOR PLAINTIFFS,**
**JUDY NICOLE JACOBS, INDIVIDUALLY**
**AND AS NEXT FRIEND OF C.J., A**
**MINOR, AND CAMERAN E. JACOBS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record by first class mail, certified mail, e-file, facsimile transmission, e-mail or hand delivery on this 15th day of August, 2023.

*/s/Casey H. Hargroder*
CASEY H. HARGRODER